IN THE UNITED STATES DISTRICT COURT FOR THE

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

DISTRICT OF NEBRASKA          05 JAN 13  PM 2: 53

OFFICE OF THE CLERK

| | |
|---|---|
| DAVE DAHLGREN, DAHLGREN'S, INC., ) <br> THEODORE COLLIN, LLOYD ERICKSON,) <br> ERICKSON LAND AND CATTLE, DIXON ) <br> GRANSTRA d/b/a GRANSTRA CATTLE, ) <br> DG FARMS, INC., SKANE, INC., CLARK ) <br> NELSON, WELLS AG ENTERPRISES, ) <br> INC., DON SJOGREN, BJW FARMS, INC., ) <br> EWW FARMS, INC., and DUANE ) <br> KUDLACEK,, ) | CASE NO. 8:05CV15 |

Plaintiff,

vs.

FIRST NATIONAL BANK OF HOLDREGE,

Defendant.

**NOTICE OF REMOVAL**

JUDGE KOPF

**MAGISTRATE JUDGE PIESTER**

TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA:

Defendant, First National Bank of Holdrege ("FNBH") hereby files its Notice of Removal of this action from the District Court of Phelps County, Nebraska, and states as follows:

1.     FNBH is the Defendant in civil action No. CI 04-202 brought on December 14, 2004, in the District Court of Phelps County, Nebraska.  Pursuant to provisions of 28 U.S.C. §§ 1441 and 1446, FNBH removes this action to the United States District Court for the District of Nebraska, which is the judicial district in which the action is pending.

2.     The grounds for removal of this action are as follows:

a.     This is an action of a civil nature over which this Court would have original jurisdiction under 28 U.S.C. § 1331 in that it arises under the laws of the United States

within the meaning of that statute.

b.      In addition, the Plaintiffs allege that FNBH violated the Racketeer Influenced and

Corrupt Organizations Act ("RICO") at 18 U.S.C. § 1961 *et seq.*  Accordingly, this Court

would have original jurisdiction over this action pursuant to 18 U.S.C. § 1964(c).

c.      The other bases for relief asserted by the Plaintiffs in their action all arise out of

the same set of facts and are part of the same case and controversy, so that this Court has

supplemental jurisdiction over them within the meaning of 28 U.S.C. § 1367(a).

Therefore, this is an action over which this Court would have had original jurisdiction had it

been filed initially in this Court and removal to this Court is proper under the provisions of 28

U.S.C. § 1441(a) and/or (b).

3.      The Complaint filed by the Plaintiffs in the District Court of Phelps County was

filed on December 14, 2004 but was not served upon FNBH until December 22, 2004 when

service was effected on FNBH by way of its entry of a Voluntary Appearance filed by FNBH in

the District Court of Phelps County, Nebraska.  This Notice of Removal is therefore timely under

28 U.S.C. § 1446(b) because this Notice of Removal is filed within 30 days of FNBH's receiving

the Complaint "by service or otherwise" within the meaning of 28 U.S.C. § 1446(b).

4.      Pursuant to the provisions of 28 U.S.C. § 1446(a), FNBH attaches to this Notice

and incorporates by reference copies of the following papers, which are all of the pleadings and

orders served on or filed by it prior to its removal of this action:

a.      The Plaintiffs' Complaint and Praecipe filed on December 14, 2004, in the

District Court of Phelps County, Nebraska, Case No. CI 04-202, which is marked as

Exhibit "A."

b.      The Defendant's Voluntary Appearance, served on December 22, 2004, and filed in the District Court of Phelps County, Nebraska, Case No. CI 04-202, which is marked as Exhibit "B."

5.      Written notice of the filing of this Notice of Removal will be served on counsel for Plaintiffs as required by law.

6.      A true and correct copy of this Notice of Removal will be filed with the Clerk of the District Court of Phelps County, Nebraska, as required by law, and served upon counsel for the Plaintiffs.

WHEREFORE, Defendant First National Bank of Holdrege requests that this case be removed from the District Court of Phelps County, Nebraska, where it is now pending, to this Court, and that this Court accept jurisdiction of this action and that this action be placed upon the docket of this Court for further proceedings, as if the case had been originally instituted in this Court.

DATED this 13th day of January, 2005.

FIRST NATIONAL BANK OF HOLDREGE,
Defendant

By: _____
William F. Hargens, NE #16578
Robert J. Bothe, NE #15018
James J. Niemeier, NE #18838
Matthew W. Lytle, NE #22928
McGrath North Mullin & Kratz, PC LLO
Suite 3700 First National Tower
1601 Dodge St.
Omaha, Nebraska 68102
(402) 341-3070
(402) 341-0216 fax
whargens@mnmk.com
rbothe@mnmk.com
jniemeier@mnmk.com
mlytle@mnmk.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on Plaintiffs' attorneys, Jeanelle R. Lust and Rodney M. Confer, Knudsen, Berkheimer, Richardson & Endacott, LLP, 1248 "O" Street, Suite 1000, Lincoln, Nebraska 68508, and on the Clerk of the District Court of Phelps County, Nebraska, P.O. Box 462, Holdrege, Nebraska 68949, via United States mail, postage prepaid, this 13th day of January, 2005.

Matthew W. Lytle

## IN THE DISTRICT COURT OF PHELPS COUNTY, NEBRASKA

DAVE DAHLGREN, DAHLGREN'S, INC.,
THEODORE COLLIN, LLOYD ERICKSON,
ERICKSON LAND AND CATTLE,
DIXON GRANSTRA d/b/a GRANSTRA
CATTLE, DG FARMS, INC., SKANE, INC.,
CLARK NELSON, WELLS AG ENTERPRISES,
INC., DON SJOGREN, BJW FARMS, INC.,
EWW FARMS, INC., and DUANE KUDLACEK,

            Plaintiffs,

    vs.

FIRST NATIONAL BANK OF
HOLDREGE,

            Defendant.

CASE NO.  CI04-202

COMPLAINT
AND
PRAECIPE

**FILED**

DEC 1 4 2004

JENNIFER L. NELSON
CLERK DISTRICT COURT
PHELPS COUNTY

---

### I.

### DEFENDANT AND OTHER RELEVANT NON-PARTIES

1.    "First National Bank of Holdrege ("FNB-H")" is a national bank with an office in

Holdrege, Nebraska. At times material to this action, FNB-H has acted through its officers and

agents, including but not limited to, Kenneth Slominski and Eric Titus.

2.    Kenneth Slominski ("Slominski") is the former president of FNB-H.

3.    Eric Titus ("Titus") is an officer and director of FNB-H.

4.    "CFI" refers to Carter Feeders, Inc., a Nebraska corporation which from 1989

through 1999 owned and operated a cattle feedyard near Orleans, Nebraska. "CFF" refers to

Carter Feeder Finance, Inc., the financing arm of CFI. Dennis Damrow owned 10% of CFI and

10% of CFF, and was the treasurer and general manager (including feedyard manager) of CFI

PENGAD 800-631-6989    EXHIBIT "A"

and CFF until the fall of 1999. From at least 1989 to 1999 FNB-H provided financing for CFI and CFF. CFI and CFF are not parties to or defendants in this case and are referenced herein for definitional purposes.

5.      "Damrow" refers to Dennis Damrow, an individual who resides at East Shore Dr., No. 24; Johnson Lake; Elwood, NE 68937. Damrow was the president and day-to-day manager of Damrow Cattle and DFF. Damrow owned 50% of Damrow Cattle, 50% of DFF, 10% of Carter Feeders, and 10% of CFF, and was the treasurer and general manager of Carter Feeders and CFF until the fall of 1999. Damrow is not a party to or a defendant in this case, and is referenced herein for definitional purposes. Damrow was a Chapter 7 Debtor in *In Re Dennis Damrow* and has been granted a discharge. Damrow has pled guilty to and been convicted of federal bank fraud and is awaiting sentencing.

6.      "DCC" refers to Damrow Cattle Co., Inc., a Nebraska corporation which had a place of business located on Route 3, P.O. Box 706, Holdrege, Nebraska 68949. DCC is a Chapter 7 Debtor in *In Re Damrow Cattle Co., Inc.*, United States Bankruptcy Court for the District of Nebraska, Case No. 0 1-80266. DCC is not a party to or a defendant in this case and is referenced herein for definitional purposes. FNB-O placed DCC into receivership on January 11, 2001.

7.      "DFF" refers to Damrow Feeder Finance, Inc., a Nebraska corporation which had its principal offices at P. 0. Box 706, Holdrege, Nebraska. FNB-H provided financing to DFF. DFF is not a party to or a defendant in this case and is referenced herein for definitional purposes.

8.      "Morken" refers to John Morken, who individually and through his wholly-owned company, Spring Grove Livestock, traded in and fed cattle at numerous feedlots in the Midwest,

2

including DCC and CFI. Morken filed a Chapter 11 Bankruptcy in the United States Bankruptcy Court for the District of Minnesota on June 10, 1994 which was converted to a Chapter 7 on February 22, 1995. Morken is not a party to or a defendant in this case and is referenced herein for definitional purposes.

9.     "Spring Grove Livestock" refers to Spring Grove Livestock Exchange, Inc., a corporation wholly owned by John Morken. Spring Grove Livestock is not a party to or a defendant in this case and is referenced herein for definitional purposes. On June 10, 1994, Spring Grove Livestock filed a bankruptcy petition in the United States Bankruptcy Court for the District of Minnesota contemporaneously with Morken.

10.     "First National Bank of Omaha ("FNB-O")" is a national bank with an office located at First National Center, 1620 Dodge Street, Omaha, NE  68102.

## II.

## FNB-H'S KNOWLEDGE OF THE DESPERATE CONDITION OF DCC

11.     FNB-H knew or should have known that its customers DCC and DFF were in poor financial condition on the verge of collapse well before DCC went into receivership in January 2001. It knew or should have known in several ways:

## A.

## CFI and CFF

12.     In late 1989, CFI began as a Commercial Feedlot Business near Orleans, Nebraska. The Shareholders included Damrow, his brother Martin Damrow, and their father, Donald Damrow. The Non-Damrow Shareholders were farmers and a doctor with no prior feedlot management experience.

13.     In 1990, CFF Inc. began as a means of financing CFI's customers through a credit line at FNB-H.

14.     Damrow, a CFI partner, was employed as manager of the CFI/CFF business. Damrow had sole and complete control of the day-to-day management of CFI and CFF. He also owned/managed DCC and DFF at the same time. All of these entities were financed through FNB-H.

15.     In July and August of 1999, the Non-Damrow Shareholders began to suspect that there were problems with Damrow's management of CFI and CFF.

16.     In September 1999, the Non-Damrow Shareholders and their attorney informed FNB-H that Damrow had submitted false financial statements to FNB-H.

17.     FNB-H then took steps that forced CFI into bankruptcy in December of 1999. Upon investigation in the bankruptcy, CFI's Non-Damrow Shareholders discovered numerous questionable banking practices by FNB-H including:

    (a)     FNB-H, from as early as 1990, overlooked and/or allowed Damrow to commit check kiting, incur overdrafts and maintain overdue CFF notes. Damrow had sole control over CFI/CFF's finances and banking. CFI was overdrawn 56% of the time and CFF was overdrawn 43% of the time. Many months these companies were overdrawn between $500,000.00 and $1,000,000.00

    (b)     The Non-Damrow Shareholders discovered the Morken transactions as described below.

    (c)     In 1997, CFI took out a mortgage loan with Metropolitan Life and the shareholders made capital injections based on information provided by FNB-H. In 1997, FNB-H's loan committee's CFI note memorandum underreported

$845,833.61 in CFI debt from March 31, 1997 to February 3, 1998. FNB-H was aware or should have been aware that $1,932, 409.28 was due/overdue on CFF notes (plus interest); however, this information was not provided to Metropolitan Life or the Non-Damrow Shareholders.

(d) Packer proceeds from the sale of fat cattle to meat packers were deposited into the wrong accounts. FNB-H was aware that some of CFI's Packer checks were deposited into DCC's accounts by Damrow and not returned to CFI by Damrow. This left CFF notes unpaid for up to one year and allowed Damrow to benefit his family-owned feedlot, DCC, and himself to the detriment of CFI and CFF.

18: These banking irregularities and diversions of CFI funds by Damrow were repeatedly pointed out to FNB-H, its officers and attorneys on numerous occasions from September 7, 1999 forward, continuing through the spring and summer of 2000.

19. Ultimately the Non-Damrow Shareholders were able to reach settlement with FNB-H.

## B.

### Frauds Against FNB-O

20. Beginning in 1997 and continuing until April 14, 2000 FNB-H sold to FNB-O participations in FNB-H's loans to DCC and DFF.

21. In early 2000 FNB-H asked FNB-O to refinance all of DCC's and DFF's loans with FNB-H, and FNB-O agreed.

22. On April 14, 2000, FNB-O refinanced FNB-H's loans to DCC and DFF by making $8,000,000 direct loans to DCC ("8,000,000 take out loan").

5

23.    Within eight months of making the $8,000,000 take out loan, DCC's business failed. FNB-O forced DCC into receivership on January 11, 2001. As a result, FNB-O sued FNB-H for its losses and upon information and belief received a substantial settlement.

24.    FNB-O alleged in that lawsuit that while it was a participant in DCC's loans, and at the time FNB-O made the $8,000,000 take out loan, FNB-H and its individual employees knew and participated in a scam to keep DCC operating. FNB-O further alleged FNB-H knew that DCC's business was failing, and through concealments, misrepresentations and actively participating in fraud, FNB-H misled FNB-O into refinancing FNB-H's loans to DCC so FNB-O rather than FNB-H would take the loss.

25.    With knowledge of the misuse of fat cattle proceeds and fraudulent activities described below, FNB-H and its officers concealed and affirmatively omitted material information to FNB-O to induce FNB-O to participate in DCC loans and ultimately to make the $8,000,000 take out loan. In reliance on these misrepresentations and concealments, FNB-O made the April 14, 2000 $8,000,000 take out loan to refinance FNB-H's loans to DCC and DFF.

26.    FNB-H knew that if FNB-O found out about these misrepresentations and concealments, FNB-O would sue FNB-H to recover its losses in the take out loan and therefore continued actively working to keep DCC and DFF in business even after the take out loan by defrauding DCC and DFF's customers and grain providers into believing DFF and DCC were profitable businesses.

## C.

## Operation of DCC and DFF

27.     During their operation, DCC and DFF obtained their financing from FNB-H. DCC was a custom feedyard which purchased cattle to feed for the purpose of resale to DCC's customers.  Some DCC customers needed financing for the purchase and feeding of their cattle.

28.     DCC had its customers obtain financing through DFF.  Both DCC and DFF borrowed money from FNB-H. DCC borrowed money from FNB-H to finance the purchase of cattle and for its working capital needs to pay its expenses, and DFF borrowed money from FNB-H that it would lend to DCC's customers so they could finance their purchase, ownership, and feeding of cattle.

29.     In a typical customer-financed transaction, DCC would purchase cattle, then sell those cattle to its customers and provide feeding services to its customers. If its customer also needed to borrow money to purchase the cattle from DCC, that customer could borrow the money from DFF to pay the purchase price to DCC for the cattle. DFF's customer would execute and deliver a promissory note to DFF. DFF, in turn, would assign the promissory note to FNB-H as collateral for DFF's loan from FNB-H.  FNB-H then would advance funds to DFF secured by the customer's promissory note so that DFF would have the money to lend to DCC's and DFF's joint customer. That joint customer, in turn, could purchase, own, and feed cattle at DCC.

30.     DCC also acted as the marketing agent for the sale of its customers' finished (fat) cattle. This meant that when DCC's customers' cattle were finished, DCC would arrange for a packer to purchase the cattle. The packer paid the purchase price for the cattle by a check to DCC or jointly payable to DCC and FNB-H ("fat cattle proceeds"). The proceeds were then deposited into DCC's deposit account at FNB-H. DCC was, in turn, to have used the DCC's

7

customers' fat cattle proceeds for three purposes: (1) to pay DCC for the custom feeding of the cattle *(i.e.,* feed, yardage, veterinary bills); (2) repay the customers' loans from DFF which DFF had assigned to FNB-H; and (3) to disburse the equity, if any, to its customer. Upon receipt of funds from DCC, DFF was to then repay the funds originally borrowed from FNB-H and thereby pay the customer's obligation under the customer's note assigned to, and held by FNB-H.

31.     DCC, DFF, and FNB-H did not always handle cattle financing transactions in the above-described fashion.  Upon information and belief, instead of making additional risky loans to DCC, FNB-H made or acquiesced in DFF's customer's becoming unwitting financiers of DCC.  Often customer promissory notes belonging to DFF, which should have been paid from fat cattle proceeds, were left unpaid to supply DCC with working capital. FNB-H allowed, participated, or acquiesced in the misuse of DCC's customers' fat cattle proceeds, to avoid problems with its legal lending limit to DCC and to avoid making further loans to DCC.

32.     Upon information and belief, Damrow and FNB-H handled CFI and CFF transactions in substantially the same fashion as described above. Moreover, when DCC or DFF experienced working capital shortages, FNB-H misapplied or allowed the misapplication by Damrow of CFI's customers' fat cattle proceeds to pay DCC's and DFF's loans from FNB-H.

33.     The practice of misusing DFF and CFF's customers' fat cattle proceeds for DCC's working capital needs was unknown to DFF and CFF's customers who were unwitting participants.

34.     During all times of the operation of DCC and DFF, FNB-H and its officers knew or should have known that DCC and DFF regularly and consistently misapplied customers' fat cattle proceeds to pay DCC's operating expenses rather than to repay those customers' promissory notes with DFF.

**D.**

## The Morken and Spring Grove Livestock Transactions

35.     From the early 1990's through mid-1994, Morken, individually and through his

company, Spring Grove Livestock, traded in and fed cattle at DCC and CFI. In 1994, CFI and

DCC sold cattle to Morken financed by CFF (with respect to the cattle located at CFI) and DFF

(with respect to the cattle located at DCC); CFF and DFF in turn borrowed money from FNB-H

to finance Morken and Spring Grove Livestock's purchases and feeding.

36.     On June 9, 1994, Damrow learned that Morken and Spring Grove Livestock were

about to file bankruptcy. Damrow went to FNB-H and met with Slominski to tell him about the

Morken and Spring Grove Livestock situation, and FNB-H decided to immediately foreclose all

of the Morken cattle at DCC and CFI.

37.     On June 9, 1994, FNB-H foreclosed all of the Morken cattle located at DCC and

sold the foreclosed cattle to DCC for $2,948,584.56.

38.     On June 9, 1994, FNB-H lent DCC $2,948,584.56 to purchase the foreclosed

cattle. However, because of FNB-H's legal lending limitations, FNB-H was not able to lend

DCC all the money DCC needed to continue to operate. As a result, DCC experienced working

capital shortages.

39.     These working capital shortages led to the practice of the misuse of fat cattle

proceed checks as described above.

40.     Similar transactions occurred with respect to the Morken and Spring Grove

Livestock cattle located at CFI which had a value of approximately $2,238,949.67. Damrow

arranged for FNB-H to lend CFI approximately $3,000,000 to purchase the cattle at the June 9,

1994 foreclosure sale. Some of the sale proceeds were used to repay the Morken promissory

notes to CFF that had been pledged to FNB-H.  Damrow arranged for FNB-H to lend CFI the money to purchase the foreclosed cattle located at CFI.

41.     On or about June 10, 1994, (the day after FNB-H's foreclosure of the Morken cattle) Morken and Spring Grove Livestock filed bankruptcy in the United States Bankruptcy Court for the District of Minnesota.

42.     Upon information and belief, sometime between June 9, 1994 and June 20, 1994, FNB-H informed Damrow that seven loan documents which Morken gave to CFF totaling $3,120,000 and six loan documents which Morken gave to DFF totaling $4,175,000 needed to be altered to make Spring Grove Livestock the obligor instead of Morken.

43.     Upon information and belief, representatives of FNB-H explained to Damrow that the thirteen Morken loan documents needed to be altered to make them consistent with a financing statement which FNB-H had filed and to improve FNB-H's lien priority compared to other creditors and the bankruptcy trustees who claimed the same cattle. The thirteen loan documents were originally prepared on a typewriter located at DCC. To disguise the alterations, the thirteen loan documents were brought to the same typewriter at DCC for alteration.

44.     On information and belief, some time between June 9, 1994 and June 20, 1994, representatives of FNB-H came to DCC to alter the thirteen loan documents.

45.     On information and belief, Damrow's secretary, Cottie Brunz, inserted the thirteen loan documents into DCC's typewriter and made the alterations under the direction of FNB-H's representatives. Prior to the alteration, the loan documents suggested that they were executed by Morken, individually. After alteration, the loan documents indicated that they were executed by Spring Grove Livestock with John Morken signing as "authorized agent."

46.     The Bankruptcy Trustee discovered that the thirteen loan documents DFF and CFF attached to their Proofs of Claim had been altered before being filed with the Minnesota Bankruptcy Court. The discovery of the alterations was a great concern to FNB-H.

47.     On or about October 11, 1994, the Trustee of the Spring Grove Livestock bankruptcy estate, filed a Complaint against DCC, DFF, FNB-H, and others in the United States Bankruptcy Court for the District of Minnesota ("Minnesota Lawsuit"). The Minnesota Lawsuit put at issue the consequences of the thirteen altered loan documents.

48.     Once the Trustee discovered the alterations, FNB-H and Damrow discussed between themselves how to settle the Minnesota Lawsuit before the details of the alteration became public. These discussions resulted in an Agreement dated February 27, 1995 among FNB-H, DCC, DFF, and Damrow acting on behalf of CFI and CFF (the "February 27, 1995 Agreement").

49.     In the February 27, 1995, Agreement, FNB-H, DCC, DFF, and Damrow acting on behalf of CFI and CFF agreed: (1) they would offer to settle the Minnesota Adversary Proceeding for up to $2,592,767.12 (50% of the value of the cattle FNB-H foreclosed on June 9, 1994); (2) FNB-H would fund 50% of the settlement payment ($1,296,383.56); (3) DCC would fund 56.84% of 50% of the settlement payment (approximately $736,864); (4) CFI would fund 43.16% of 50% of the settlement payment (approximately $449,519); (5) FNB-H would lend DCC and CFI the money needed to fund their shares of the settlement payments.

50.     As a result of the payments that DCC, DFF, CFI, and CFF were required to make to fund the settlement of the Minnesota Lawsuit, DCC's working capital shortages became even worse. As a result, Damrow's and the Defendants' practice of misusing customers' fat cattle proceeds to pay DCC's bills and expenses continued and escalated.

51.     FNB-H's practice of allowing or participating in the misuse of the DCC and DFF's customers' fat cattle proceeds and CFI's fat cattle proceeds for DCC's working capital needs continued for five to six years.

52.     Although FNB-H had direct and actual knowledge of DCC's and CFI's financial difficulties arising out of the Morken and Spring Grove Livestock bankruptcies and its own fraudulent loan activities in this regard, FNB-H and its officers actively concealed these matters.

### III.

### MISREPRESENTATIONS TO PLAINTIFFS AND DAMAGES

### A.

### Dave Dahlgren

53.     Dave Dahlgren resides at 73765 R Road, Holdrege, NE 68949.  He did busines with DCC personally and as an officer and director of Dahlgren's Inc.

54.     Dahlgren's, Inc. is a Nebraska corporation with its principal place of business in Holdrege, Phelps County, Nebraska.

55.     Dave Dahlgren had personally banked with FNB-H his entire adult life. Dahlgren's Inc. banked with FNB-H since its inception in 1983.

56.     As part of his and Dahlgren Inc.'s business plan, Dave Dahlgren would harvest and deliver wet corn to DCC which was located 1½ miles south of his farm.  The grain he delivered became part of a grain bank and he was paid for his corn as it was fed to cattle at the feedlot.

57.     In order to get the full benefit of the grain bank, Dave Dahlgren would routinely own and feed a half a pen of cattle at DCC.

58.     Knowing that the cattle feeding industry was volatile and capital intensive, Dave Dahlgren routinely asked FNB-H loan officers about the financial stability of DCC.

59.     In the early winter of each year, Dave Dahlgren would go to FNB-H to obtain an operating line of credit for the year for himself and Dahlgren's, Inc.  In order to get these loans, Dave Dahlgren would develop balance sheets and cash flow projections that would involve carrying up to $250,000 worth of inventories at DCC.  In response to inquiries he made concerning DCC, Dahlgren was always reassured by FNB-H's loan officers that DCC was financially stable and that he should not give providing inventories to DCC a second thought.

60.     Specifically in February 2000, Dave Dahlgren was reassured that DCC was financially stable by officers of FNB-H, and Dave Dahlgren obtained an operating loan for himself and Dahlgren's, Inc. on the basis of providing inventories to DCC.

61.     As a proximate result of the misrepresentations of FNB-H, Dave Dahlgren and Dahlgren's Inc. have sustained the following losses as outlined below:

Cattle Losses

Dave Dahlgren

| | | |
|---|---|---|
| ½ lot 1264 | = | $61,233.86 |
| Feed bills | = | 6,495.50 |
| Legal fees | = | 924.97 |
| Total | = | $68,654.33 |

Dahlgren's Inc.

| | | |
|---|---|---|
| 66% lot 1268 | = | $89,121.17 |
| Feed bills | = | 6,737.38 |
| Legal fees | = | 1,899.95 |

13

|                |   |             |
|----------------|---|-------------|
| Total          | = | $97,758.50  |

Corn Losses

Dave Dahlgren

| 5249.89 bushels @ $2.03 | = | $10,657.28 |

Dahlgren's Inc.

| 13,557.88 bushels @ $2.03 | = | $27,522.50 |

Minus credits in settlement from FNB-O and credit carry forward

| Dave Dahlgren's Credits | $28,494.43 FNB-O |
|                         | 1,555.43 Credit  |
| Dahlgren's Inc.         | $38,405.29 FNB-O |

Total Losses

| Dave Dahlgren  | $49,261.75 |
| Dahlgren's Inc. | $86,875.71 |

## B.

### Theodore ("Ted") Collin

62.     Ted Collin resides at 10806 – 738 Road, Loomis, NE  68958.

63.     Ted Collin and his father, Franz Collin, did business with DCC.  Franz Collin has assigned his interest in any claims against FNB-H to Ted Collin pursuant to the assignment attached hereto as Exhibit A.

64.     Ted Collin was employed by FNB-H from May 1983 to January 2000.  He also operated a farming operation with his father, Franz Collin.

65.     Up through the 2000 season, Ted Collin delivered wet corn to DCC.

66.    While he was employed at FNB-H, his superiors at FNB-H, including Eric Titus and Ken Slominski, always led Ted Collin to believe that DCC was in good financial shape. Ted Collin, in his position as a loan officer at FNB-H, would frequently take the information FNB-H provided concerning the financial stability of DCC and relay it to other customers of the bank, believing it to be true. Ted Collin also relied on that information in conducting his own farming operations.

67.    To cover up Damrow's frauds and to explain away the information that was being provided by CFI's Non-Damrow Shareholders beginning in the summer of 1999, other officers of FNB-H falsely told Ted Collin that the Non-Damrow Shareholders were stealing from CFI and CFF.

68.    In September 2000, Ted Collin delivered 24,799.94 bushels of wet corn to DCC. During the fall of 2000, the corn was fed to cattle and Ted Collin was paid certain amounts for the corn fed at the feedlot.

69.    When DCC went into receivership on January 11, 2001, Ted Collin still had 819.39 bushels of wet corn unfed at DCC. Also, two payments made by check for corn fed were returned NSF ("Not Sufficient Funds"): one to Ted Collin for $11,110.00 and one to Franz Collin for $12,598.72.

70.    Therefore, Ted Collin's wet corn loses proximately caused by misrepresentations of FNB-H total $25,372.08 calculated as follows:

| | | |
|---|---|---|
| 1) | NSF check to Ted Collin | $11,110.00 |
| 2) | NSF check to Franz Collin | $12,598.72 |
| 3) | 819.39 bushels @ $2.03 = | $1,663.36 |
| | Total | $25,372.08 |

71.     Ted Collin also fed cattle at DCC based on the representations made by FNB-H. Ted Collin ultimately settled with FNB-O on the cattle he had at DCC for 40% of value. As a proximate cause of the misrepresentations and concealments of FNB-H, the net loss on the cattle remaining at DCC was $22,501.59.

72.     In addition, Ted Collin incurred attorneys' fees and expenses as a result of having commodities at DCC at the time of the receivership in order to reach settlement with FNB-O. Those fees total $1,216.00.

## C.

### Erickson Land and Cattle and Lloyd Erickson

73.     Lloyd Erickson resides at 315 18th Avenue, Holdrege, NE 68949.

74.     Erickson Land and Cattle Inc. is a Nebraska farming corporation with its principal place of business in Holdrege, Nebraska whose officers and directors include Chris Erickson, Lloyd's son, and Lloyd Erickson.

75.     Lloyd and Chris Erickson were lifelong customers of FNB-H both personally and for their farming corporation Erickson Land and Cattle, Inc.

76.     Lloyd Erickson and Erickson Land and Cattle, Inc. were also customers of DCC.

77.     Routinely, beginning in the late 1980's, given the risky nature of cattle feeding, Lloyd and Chris Erickson asked FNB-H's officers about the financial health of DCC and were assured of its financial well-being.

78.     Specifically, Chris Erickson and Lloyd Erickson inquired of FNB-H about the financial stability of DCC when Spring Grove Livestock and John Morken declared bankruptcy. Lloyd and Chris Erickson knew DCC fed a lot of cattle for those entities. Lloyd and Chris

16

Erickson asked FNB-H president, Ken Slominski, at that time if DCC was a safe place to feed cattle, and Ken Slominski assured them that it was.

79.     Continuing through early 2000, Chris and Lloyd Erickson periodically inquired about the financial health of DCC and were assured of DCC's financial health by officers of FNB-H.

80.     In early 2000, FNB-H's new president, Kirk Riley, and Lloyd and Chris Erickson's loan officer, Eric Titus, came to their farm for an inspection visit. By this time, Lloyd and Chris Erickson had learned of the CFI bankruptcy and allegations of Damrow's dishonesty being made by the Non-Damrow Shareholders, and they again inquired about the financial health of DCC. Eric Titus assured Chris and Lloyd Erickson that everything was fine at DCC, and Kirk Riley made no comment.

81.     On December 15, 2000, Damrow came to Lloyd and Chris Erickson's farm with a bill for feeder cattle. Eric Titus was present when Lloyd and Chris Erickson paid for the cattle, but Eric Titus said nothing about the poor financial health of DCC at that time.

82.     Less than one month later, DCC went into receivership and Erickson Land and Cattle, Inc. lost its investment in the feeder cattle.

83.     As a proximate result of the misrepresentations of FNB-H, Erickson Land and Cattle, Inc. was damaged as follows:

Corn – 34,356.48 bushels @ $2.03 = $69,743.66

Attorneys fees = $26,476.62

84.     As a proximate result of the misrepresentations by FNB-H, Lloyd Erickson sustained cattle loss damages in the amount of $66,897.21 after settlement with FNB-O.

17

## D.

## Dixon Granstra, Granstra Cattle and DG Farms, Inc.

85.     Dixon Granstra resides in Sheldon, Iowa.  He does business as Granstra Cattle and is an officer and director of DG Farms, Inc.

86.     DG Farms, Inc. is an Iowa corporation with its principal place of business in Sheldon, Iowa.

87.     Dixon Granstra d/b/a Granstra Cattle and DG Farms, Inc. did business with DCC, including procuring cattle for DCC and feeding cattle at DCC.

88.     In the spring and summer of 2000, Dixon Granstra became concerned about operations at DCC because of a comment Damrow made to him about the number of cattle Damrow said he was feeding at DCC, which seemed overinflated to Dixon Granstra based on the size of DCC's operation.

89.     As a result of this conversation, Dixon Granstra asked his banker, Jerry Adams with Security State Bank, to investigate the financial stability of DCC.

90.     As an agent of Dixon Granstra, Jerry Adams contacted officers of FNB-H and arranged a meeting with officers of FNB-H.  During this meeting, Jerry Adams was assured orally and in writing by FNB-H that DCC was financially stable and that Dixon Granstra and his companies could and should continue to do business with DCC.

91.     As a result of these misrepresentations, Dixon Granstra continued to do business with DCC.  As a proximate result of FNB-H's misrepresentations, Dixon Granstra d/b/a Granstra Cattle and DG Farms, Inc. have been damaged in an amount exceeding $700,000.00, which will be proved later at trial.

18

## E.

### Harold D. Erickson and Skane, Inc.

92.     Harold D. Erickson resides at 74029 U.S. Highway 183, Holdrege, NE.  He did business personally with DCC and as an officer and director of Skane, Inc.

93.     Skane, Inc. is a Nebraska corporation with its principal place of business in Phelps County, Nebraska.

94.     Harold D. Erickson and Judy Erickson have assigned all claims they may have against FNB-H to Skane, Inc. and that assignment is attached hereto as Exhibit B.

95.     Harold Erickson and Skane, Inc. were not customers of FNB-H in 2000. However, Harold Erickson knew the officers of FNB-H.

96.     Each year Harold Erickson called officers of FNB-H and asked if it was in the best interest of his personal farming operations and Skane, Inc. to do business with DCC.  Each year, including 2000, Harold Erickson was assured by officers of FNB-H that DCC was "ok" to do business with.

97.     In reliance on the misrepresentations of FNB-H's officers, Harold Erickson and Skane, Inc. continued to do business with DCC.

98.     As a direct result of the misrepresentations of FNB-H-s officers, Skane, Inc. was damaged as follows:

| | |
|---|---|
| Legal Fees | $80,382.21 |
| Cattle Losses | $61,233.86 |
| Feed Bills | $6,495.50 |
| 16,704.97 bushels of corn @ $2.03 | $33,911.09 |
| Total Damages to Skane, Inc. | $182,022.66 |

## F.

### Clark Nelson

99.     Clark Nelson resides at 73862 "V" Road, Funk, Nebraska.

100.    He was a customer of and did business with DCC.

101.    He was a customer of FNB-H and continues to be a customer of FNB-H.

102.    Routinely each year, Clark Nelson would inform FNB-H that he would be hauling grain to DCC as part of his business plan. Each year, he was assured by officers of FNB-H that DCC was okay to do business with.

103.    Specifically, in the early winter of 2000, upon inquiry, Clark Nelson was informed by his FNB-H loan officer, Craig DeWalt, that DCC was financially stable.

104.    Relying on these misrepresentations, Clark Nelson delivered wet corn to DCC.

105.    As a proximate result of the activities of FNB-H, Clark Nelson lost 11,152 bushels of corn when FNB-O put DCC into receivership (FNB-O having claimed and received a first priority lien in the corn). Therefore, Clark Nelson has suffered damages as a proximate result of FNB-H's activities in the amount of $22,638.56.

## G.

### Gary Wells and Wells Ag Enterprises, Inc.

106.    Gary Wells is a resident of Phelps County, Nebraska. He is an officer and director of Wells Ag Enterprises, Inc.

107.    Wells Ag Enterprises, Inc. is a farming corporation with its principal place of business in Phelps County, Nebraska.

108.    Wells Ag Enterprises, Inc. did business with DCC.

109.    Up until 1999, Gary Wells and Wells Ag Enterprises, Inc. were customers of FNB-H.

110.    While he was a customer of FNB-H, Gary Wells was assured by officers of FNB-H that DCC was financially stable.

111.    Even after ceasing to be a customer of FNB-H, Gary Wells had conversations with FNB-H officers, including Eric Titus, assuring him that he and Wells Ag Enterprises, Inc. should continue to do business with DCC.

112.    Relying on the misrepresentations and concealments by FNB-H, Wells Ag Enterprises, Inc. delivered farm commodities to DCC.  At the time FNB-O put DCC in receivership, Wells Ag Enterprises, Inc. had the following commodities at DCC in which FNB-O claimed and received a first priority lien:

47,334.51 bushels of corn and 154.86 tons of silage

113.    As a proximate result of the misrepresentations and concealments of FNB-H, Wells Ag Enterprises incurred the following damages:

| | |
|---|---|
| Corn loss: | $96,089.06 |
| Silage loss: | $3,817.50 |
| Attorneys' fees and expenses in the receivership: | $15,046.67 |
| Total | $114,953.23 |

**H.**

**Robert ("Bob") Wells and BJW Farms, Inc.**

114.    Bob Wells is a resident of Phelps County, Nebraska and an officer and director of BJW Farms, Inc.

115.    BJW Farms, Inc. is a Nebraska farming corporation with its principal place of business in Phelps County, Nebraska.

116.    Bob Wells is Gary Wells' brother.

117.    Bob Wells and BJW Farms, Inc. were customers of FNB-H until the fall of 1999, and were never told by any officers of FNB-H that DCC was in financial difficulty.

118.    Furthermore, based on representations made to Bob Wells' brother, Gary Wells, in the year 2000 by FNB-H's officers that DCC was financially stable, Bob Wells and BJW Farms, Inc continued to do business with DCC and delivered farm commodities to DCC in the late fall of 2000.

119.    When FNB-O placed DCC in receivership in January 2001, BJW Farms, Inc. had 22,159.54 bushels of corn at DCC in which FNB-O claimed and received a first priority lien.

120.    As a proximate result of the misrepresentations and concealments of FNB-H, BJW Farms, Inc. was damaged as follows:

| | |
|---|---|
| Corn loss: | $44,983.67 |
| Attorneys' fees and expenses in the receivership | $5,000.00 |
| Total | $49,983.67 |

**I.**

**EWW Farms, Inc.**

121.    EWW Farms, Inc. is a farming corporation with its principal place of business in Phelps County, Nebraska.

122.    Bob and Gary Wells are officers and directors of EWW Farms, Inc.

123.    In reliance on FNB-H misrepresentations made to members of the Wells family, EWW Farms, Inc. delivered farm commodities to DCC.

124.    At the time that DCC was put into receivership by FNB-O, EWW Farms, Inc. had 1,415 bushels of corn at DCC in which FNB-O claimed and received a first priority lien.

125.    As a proximate result of the activities of FNB-H, EWW Farms, Inc. has been damaged in the amount of $2,872.45.

## J.

### Duane Kudlacek

126.    Duane Kudlacek is a resident of Phelps County, Nebraska.  He is married to Bob and Gary Wells' sister.

127.    Duane Kudlacek was a customer of and did business with DCC.

128.    Duane Kudlacek was a customer of FNB-H for many years up to the year 2000.

129.    At no time did any officers of FNB-H alert Duane Kudlacek that DCC was anything other than financially stable.  In fact, they affirmatively represented to him that DCC was a stable company.

130.    Based on misrepresentations made to his brother-in-law by FNB-H concerning the financial stability of DCC, Duane Kudlacek delivered farm commodities to DCC.

131.    At the time that FNB-O placed DCC into receivership, Duane Kudlacek had 15,274.89 bushels of corn at DCC in which FNB-O claimed and received a first priority lien.

132.    Therefore, as a proximate result of the activities of FNB-H, Duane Kudlacek was damaged in the amount of $31,008.03.

## K.

### Don Sjogren

133.    Don Sjogren is a resident of Funk, Phelps County, Nebraska.

134.   Don Sjogren was and is a life-long customer of FNB-H, as was his father before him.

135.   Don Sjogren was a customer of and did business with DCC.

136.   In approximately July 1999, Don Sjogren received a check from DCC in the approximate amount of $200,000 for the close out on some pens of cattle. The check was returned NSF.

137.   Don Sjogren went to FNB-H to inquire about the returned check and was assured orally and in writing by FNB-H's president, Kirk Riley, that DCC was a valued, stable customer of FNB-H, and that the return of the check was a clerical error by the staff at FNB-H.

138.   Upon information and belief, at the time Don Sjogren had this conversation with Kirk Riley, DCC was substantially overdrawn on its accounts at FNB-H.

139.   Furthermore, during the course of his banking relationship with FNB-H, Don Sjogren was assured on numerous occasions by officers of FNB-H that DCC was financially stable and a good place to do business.

140.   Based on misrepresentations and concealments by FNB-H, Don Sjogren continued to do business with DCC and in the fall and winter of 2000 delivered farm commodities to and fed cattle at DCC.

141.   When DCC was placed in receivership by FNB-O in January, 2001, Don Sjogren owned or partially owned four pens of cattle and had 19,411.18 bushels of corn at DCC in which FNB-O claimed and received a first priority interest.

142.   Therefore, as a proximate result of the wrongful activities of FNB-H, Don Sjogren has been damaged as follows:

Investment in cattle

| | |
|---|---|
| Lot 1257 | $151,457.59 |
| Lot 1277 | $146,141.77 |
| Lot 1249 | $129,732.79 |
| Lot 1269 | $104,846.98 |
| Total Cattle Investment: | $532,179.13 |

Corn Losses

| | |
|---|---|
| 17,411.18 bushels @ $2.03 | 39,404.70 |
| Total Loss | $571,583.83 |
| Minus settlement from FNB-O | -$219,767.63 |
| | $351,816.20 |
| Plus attorneys' fees and costs which are estimated at this time to be proved later at trial | $15,000.00 |
| | $366,816.20 |

## IV.

## GROUNDS FOR RELIEF

### A.

### First Claim For Relief

(Fraud and Misrepresentation, Including Claims of Non-Disclosure, Deceit and Concealment)

143. Plaintiffs reallege and incorporate by reference herein all the foregoing paragraphs of this Complaint.

144. FNB-H made false and material representations directly and indirectly to Plaintiffs that were known to be false when made and/or were made recklessly without knowledge of their truth and as positive assertions.

145.   FNB-H made such representations with the knowledge and/or intention that Plaintiffs would rely upon them.

146.   Plaintiffs reasonably and justifiably relied upon FNB-H's false representations to their damage and detriment.

147.   FNB-H knew or should have had knowledge of material facts and concealed and/or suppressed these facts with the knowledge and/or intention that Plaintiffs would be misled as to the true facts or with reckless disregard for the truth of these facts.

148.   Plaintiffs were reasonably misled by FNB-H's concealment and suppression of such material facts to their damage and detriment.

149.   To the extent that such false and misleading representations and concealments were made by officers and/or agents of FNB-H, they were made within the scope of the actual, apparent, and/or ostensible authority of said officers and agents, and FNB-H is fully liable and responsible therefor. FNB-H is liable for the misrepresentations and concealments of its officers and agents who had a duty to disclose the true facts to Plaintiffs, and FNB-H is estopped from denying its responsibility therefor.

150.   FNB-H made false and misleading representations of material existing facts directly and indirectly to Plaintiffs.

151.   FNB-H made false and misleading misrepresentations as to material facts directly and indirectly to Plaintiffs with a reckless disregard for their truth or falsity.

152.   Defendants concealed and failed to disclose to Plaintiffs material past or existing facts that should have been disclosed to Plaintiffs.

153.   FNB-H knew or should have known and/or had actual or constructive knowledge that said representations were false and/or misleading, acted with indifference to their truth or

falsity, and had actual or imputed knowledge that they were concealing material facts and information from Plaintiffs, or were otherwise misleading Plaintiffs thereby. FNB-H concealed facts which in equity and good conscience should have been disclosed.

154.   FNB-H made such false and misleading representations and concealments with the intention, knowledge or reasonable probability that they would be acted and relied upon by Plaintiffs.

155.   Plaintiffs acted and justifiably relied upon said misrepresentations and concealments, all to the detriment of Plaintiffs.

156.   FNB-H had a pecuniary interest in making these misrepresentations and concealments, both in avoiding losses on its loans to DCC and DFF and in avoiding litigation with FNB-O.

157.   As the direct and proximate result of the foregoing, Plaintiffs have been and continue to be damaged as outlined above.

**B.**

**Second Claim for Relief**

(Fraudulent Inducement)

158.   Plaintiffs reallege and incorporate by reference all the foregoing paragraphs of this Complaint.

159.   FNB-H made false representations of material fact intentionally and knowingly and with intent to mislead, on which Plaintiffs justifiably relied to their damage and detriment.

160.   FNB-H made affirmative misrepresentations with reckless disregard for the consequences to and rights of Plaintiffs, on which Plaintiffs justifiably relied to their damage and detriment.

161.   FNB-H had a duty to disclose the true facts concerning their financing activities relative to DCC, and knew or should have know that ascertainment of the true facts was not within reach of the reasonably diligent attention, observation, and judgment of Plaintiffs. FNB-H knew or should have known that Plaintiffs were reasonably relying on FNB-H's proper and thorough compliance with its duties of disclosure, and knew or should have known that Plaintiffs were not in a position to independently uncover the true facts because of the affirmative acts and efforts to conceal the same.

162.   FNB-H's concealment of material information regarding the DCC finances, whether by word or conduct, was tantamount to and the equivalent of false representation(s) because it involved deliberate nondisclosure designed to prevent Plaintiffs from learning the truth. FNB-H's willful nondisclosure of material facts, which it knew or should have known to be unknown to Plaintiffs, evidences FNB-H's intent to commit actionable fraud to the detriment of Plaintiffs.

163.   FNB-H's concealments and fraud by omission of material facts while knowing that Plaintiffs were acting upon the assumption that the facts did not exist constitutes fraudulent inducement by FNB-H. FNB-H's concealments and non-disclosures were intended to and did induce Plaintiffs to continue to do business at DCC and DFF.

164.   FNB-H's actions were intended and/or known to obstruct, interfere with, and be likely to prevent Plaintiffs from learning the true and material facts as alleged herein, and were tantamount to and the equivalent of assertions by FNB-H that the fact(s) did not exist.

165.   FNB-H's concealment and non-disclosure of material facts, knowing that Plaintiffs were acting on the assumption that no such fact(s) existed, is as much fraud as if the existence of the fact(s) were expressly denied.

28

166.    Plaintiffs acted to their detriment in actual and justifiable reliance on FNB-H's misrepresentations and/or concealments.

167.    FNB-H had a pecuniary interest in concealing this information in order to protect itself from losses on its loans to DCC and DFF and avoid litigation with FNB-O.

168.    As the direct and proximate result of the foregoing, Plaintiffs have been and continue to be damaged as outlined above.

## C.

### Third Claim for Relief

(Negligence)

169.    Plaintiffs reallege and incorporate by reference all the foregoing paragraphs of this Complaint.

170.    FNB-H and its officers and agents knew or should have known about the material facts and information concerning the financial instability of DCC and DFF before and after Plaintiffs did business with DCC.

171.    FNB-H negligently misrepresented DCC's and DFF's finances directly and indirectly to Plaintiffs, failed to use reasonable care by making false and misleading representations and otherwise concealing the true facts from Plaintiffs, and failed to exercise reasonable care and competence in supplying true and correct information to Plaintiffs.

172.    FNB-H had a pecuniary interest in keeping DCC operating to protect itself from losses on its loans to DCC and DFF and to avoid litigation with FNB-O.

173.    FNB-H negligently and/or recklessly supplied false and misleading information, failed to disclose material facts, and failed to exercise reasonable care and competence in obtaining and/or communicating information to Plaintiffs and for the guidance of Plaintiffs in

29

connection with DCC, on which Plaintiffs justifiably and reasonably relied to their damage and detriment.

174.    FNB-H is liable in negligence even if it was acting honestly and in good faith because FNB-H failed to exercise that degree of care required under the circumstances.

175.    Plaintiffs were reasonably foreseeable users of commercial information supplied by FNB-H in connection with DCC and were entitled to reasonably expect and rely upon FNB-H's observance of and compliance with these standards and obligations.

176.    As a direct and proximate result of the foregoing, Plaintiffs have been and continue to be damaged in an amount as outlined above.

### D.

### Fourth Claim for Relief

(Civil Conspiracy)

177.    Plaintiffs reallege and incorporate by reference all the foregoing paragraphs of this Complaint.

178.    FNB-H, its officers, and Damrow conspired together through unlawful means to conceal the true financial condition of DCC from the Plaintiffs.

179.    This conspiracy benefited FNB-H and Damrow through the continued operation of DCC.

180.    As a proximate result of this conspiracy, Plaintiffs have been damaged as outlined above.

### E.

### Fifth Claim for Relief

(Violation of Racketeer Influence and Corrupt Organizations Act

("RICO"), 18 U.S.C. §1961 *et seq.*)

181.    Plaintiffs reallege and incorporate by reference all the foregoing paragraphs of this Complaint.

182.    As applicable herein, the term "mailed" refers to the United States' Mails and/or any other common carrier. The term "wired" or "faxed" means the use of interstate and/or intrastate wires.

183.    FNB-H is a "person" as that term is defined in the RICO statute, 18 U.S.C. § 1961(3).

184.    FNB-H is a federally chartered banking association and is an "enterprise" as that term is defined in the RICO statute, 18 U.S.C. § 1961.

185.    DCC and DFF are corporations organized under the laws of the State of Nebraska, and each constitutes an "enterprise" as that term is defined under the RICO statute, 18 U.S.C. §1961.

186.    Upon information and belief FNB-H and Damrow have engaged together in more than two predicate acts as hereinabove alleged which constitute a pattern of racketeering activity as those terms are defined under the RICO statute, 18 U.S.C. §1961. These predicate acts include, without limitation, bank fraud by defrauding FNB-O and other acts of bank fraud in its fraudulent loan activities and bankruptcy fraud in the altering of the Morken notes.

187.    Upon information and belief from as early as 1994 until January 2001, FNB-H and Damrow have engaged in and committed various offenses involving acts which are prohibited under, *inter alia,* 18 U.S.C. § 1941 (mail fraud), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. § 1344 (financial institution fraud) which further constitute a pattern of racketeering activity by and through a series of predicate acts which have continuity and a relationship to each

31

other and that amounted to a threat of continued, unlawful and illegal activity. Upon information and belief FNB-H and Damrow have, through a series of predicate acts and a pattern of racketeering activity, all of which were in violation of 18 U.S.C. § 1962, caused Plaintiffs to be damaged as outlined above.

188.    Upon information and belief FNB-H, Damrow, DCC, and DFF have conducted and participated, directly and indirectly, in the conduct of business with Plaintiffs through a series of predicate acts and a pattern of racketeering activity, all in violation of the RICO statute, 18 U.S.C. § 1962, which has caused damage to Plaintiffs in an amount to proved at trial.

189.    Upon information and belief FNB-H and Damrow have conspired to violate 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), all as alleged herein.

190.    As the direct and proximate result of the foregoing, Plaintiffs have sustained and will continue to sustain damages. Plaintiffs are entitled to recover treble damages and the costs of this suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE Plaintiffs pray for:

1)    Judgment against FNB-H for all damages and losses suffered by the Plaintiffs and for Plaintiffs' costs on Counts 1-4,

2)    Judgment against FNB-H for treble the amount of damages suffered by the Plaintiffs; for costs and for attorneys' fees on Count 5; and

3)    For such other and further relief as the court deems just and proper.

DAVE DAHLGREN, DAHLGREN'S, INC.,
THEODORE COLLIN, LLOYD ERICKSON,
ERICKSON LAND AND CATTLE, DIXON
GRANSTRA d/b/a GRANSTRA CATTLE, DG
FARMS, INC., SKANE, INC., CLARK NELSON,
WELLS AG ENTERPRISES, INC., DON
SJOGREN, BJW FARMS, INC., EWW FARMS,
INC., and DUANE KUDLACEK, Plaintiffs

By:  KNUDSEN, BERKHEIMER,
     RICHARDSON & ENDACOTT, LLP
     1248 "O" St., Suite 1000
     Lincoln, Nebraska  68508
     (402) 475-7011


By:_____
     Jeanelle R. Lust- #20556
     jlust@knudsenlaw.com
               and
     Rodney M. Confer - #10753
     rconfer@knudsenlaw.com

33

## PRAECIPE

TO THE CLERK OF SAID COURT:

Please issue summons in the above-captioned matter to First National Bank of Holdrege,

whose address is 401 East Avenue, Holdrege, Nebraska 68949, and deliver said summons to

Jeanelle R. Lust, attorney for plaintiffs, Knudsen, Berkheimer, Richardson & Endacott, LLP for

service upon defendant by certified mail.

Rodney M. Confer - #10753
Knudsen, Berkheimer, Richardson &
Endacott, LLP
1248 "O" Street, Suite 1000
Lincoln, NE 68508
(402) 475-7011

**FILED**

DEC 1 4 2004

JENNIFER L. NELSON
CLERK DISTRICT COURT
THE 7S COUNTY

34

## IN THE DISTRICT COURT OF PHELPS COUNTY, NEBRASKA

| | |
|---|---|
| DAVE DAHLGREN, DAHLGREN'S, INC., THEODORE COLLIN, LLOYD ERICKSON, ERICKSON LAND AND CATTLE, DIXON GRANSTRA d/b/a GRANSTRA CATTLE, DG FARMS, INC., SKANE, INC., CLARK NELSON, WELLS AG ENTERPRISES, INC., DON SJOGREN, BJW FARMS, INC., EWW FARMS, INC., and DUANE KUDLACEK, | Case No. CI04-202 |

Plaintiffs,

vs.

FIRST NATIONAL BANK OF HOLDREGE,

Defendant.

**VOLUNTARY APPEARANCE**

COMES NOW the Defendant, First National Bank of Holdrege (the "Bank"), a National Association, and hereby enters its Voluntary Appearance in the above-entitled action submitting itself to the jurisdiction of the Court as fully and complete as if fully served a summons herein but reserving its right to answer or otherwise plead. The Bank acknowledges receipt of a copy of the Complaint filed herein.

DATED this 22nd day of December, 2004.

FIRST NATIONAL BANK OF HOLDREGE, Defendant,

By: _____
Edward G. Warin (#14396)
Robert J. Bothe (#15018)
Matthew W. Lytle (#22928)
McGrath North Mullin & Kratz, PC LLO
1601 Dodge Road
First National Tower, Ste. 3700
Omaha, NE 68102
Phone: (402) 341-3070
Fax: (402) 341-0216

EXHIBIT "B"

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the above and foregoing was served via regular United States mail, postage prepaid, to the following on this 22nd day of December, 2004:

Jeanelle R. Lust
Rodney M. Confer
Knudsen, Berkheimer, Richardson & Endacott, LLP
1248 "O" Street, Suite 1000
Lincoln, NE  68508